**Joan ESHELMAN, Plaintiff**

v.

**AGERE SYSTEMS, INC., Defendant.**

No. Civ.A. 03–CV–1814.

United States District Court,
E.D. Pennsylvania.

Oct. 19, 2005.

---

Ronald H. Surkin, Gallagher, Schoenfeld, Surkin & Chupein, Media, PA, for Plaintiff.

David S. Fryman and William K. Kennedy, Ballard, Spahr, Andrews & Ingersoll, LLPP, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

RICE, United States Magistrate Judge.

This case presents the issue whether sufficient evidence supported a jury's verdict that plaintiff's employer perceived her as substantially limited in the major life activities of working and thinking. Although the parties disagree on the precise contours of the legal question, its resolution depends on whether the employer regarded plaintiff as disabled under the American with Disabilities Act ("ADA") based on evidence of a chemotherapy-related memory impairment. I hold that the jury verdict was supported by sufficient evidence.

## I. Introduction

Following a four-day trial, a jury awarded plaintiff Joan Eshelman $200,000 in damages ($170,000 in back pay and $30,000 in compensatory damages) from defendant Agere Systems, Inc. ("Agere") for its violation of Eshelman's rights under the ADA and the Pennsylvania Human Relations Act ("PHRA"). Agere now seeks to overturn the verdict and requests that I grant judgment in its favor as a matter of law, or alternatively, that I grant a new trial.

Agere contends Eshelman failed to offer sufficient evidence to support the jury's verdict that Agere regarded her as disabled, that she had a record of being disabled, and that Agere failed to accommodate her disability. Under any theory, the evidence viewed in the light most favorable to Eshelman must satisfy the ADA's requirement that the physical or mental impairment substantially limited one or more major life activity. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). The relevant inquiry must focus on evidence of Agere's subjective perception and recorded knowledge of Eshelman's impairment and its resulting limitations. Proof of an employer's subjective perception, of course, is rarely proved by direct evidence. *Cf. Eichorn v. AT & T,* 248 F.3d 131, 150 (3d Cir.2001) (in ERISA cases, "smoking gun" evidence of specific intent to discriminate rarely exists); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 731 (3d Cir.1988) (evidence of racial discrimination takes subtle and less apparent forms).

A careful review of the record establishes sufficient evidence to prove Agere believed—either sincerely or mistakenly—that Eshelman's memory impairment substantially limited the major life activities of thinking and working, in violation of the ADA. Similarly, the jury had sufficient evidence to conclude Agere had a record of Eshelman's impairment that substantially limited a major life activity.

Although the evidence established Eshelman had excelled at her job and was a highly regarded employee, the jury could have reasonably concluded Agere erroneously viewed her occasional memory impairment caused by the impact of chemotherapy from cancer treat-

ment as substantially limiting her ability to think or work.[1] When Eshelm in reminded Agere in 2001 of possible memory lapses that might temporarily impact her ability to travel to new job sites located between 45 minutes and 75 minutes from her residence, Agere without explanation removed Eshelman from the list of employees who would be offered jobs as part of a company-wide restructuring. For the following reasons, I deny Agere's motion.

## II. Legal Standard

■■■ Judgment as a matter of law is required when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a). A Rule 50(a) motion should be granted only if, viewing all the evidence in favor of the nonmoving party, no reasonable jury could find liability. *Grazier v. City of Phila.*, 328 F.3d 120, 123 (3d Cir.2003) (citing *McDaniels v. Flick*, 59 F.3d 446, 454 (3d Cir.1995)). Because a jury's verdict merits judicial deference, *Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 771 (3d Cir.1975), only a critical deficiency of evidence justifies reversal. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir.1995). Thus, the record must contain the "minimum quantum of evidence from which a jury might reasonably afford relief." *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 299 (3d Cir.2002). I must draw all reasonable inferences in favor of Eshelman and may not make credi-

bility determinations. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

To state a cognizable cause of action under the ADA, Eshelman must establish she is a "qualified individual with a disability."[2] *See* 42 U.S.C. § 12112(a); *Marinelli v. City of Erie*, 216 F.3d 354, 359 (3d Cir.2000). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation", can perform the essential functions of the employment position that such individual holds or desires. *Id.* A "disability" is defined as either (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) being regarded as having such an impairment. *Id.* Eshelman does not contend she was suffering from a disability at the time she was laid-off. Rather, she asserts her layoff was impermissibly based on her record of impairment and her superiors' belief that she was disabled. The underlying cause of her limitation is not in dispute; it is the effect of any resulting limitation that establishes a claim of disability. *See Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

■■■ A person is "regarded as" having a disability if she:

(1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the cov-

---

**1.** All courts to address the issue have assumed based on *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) that working is a major life activity. I instructed the jury that working and thinking are major life activities, but declined to address the issue of driving because Eshelman did not assert it was the relevant major life activity.

**2.** My analysis of Eshelman's ADA claims applies equally to her Pennsylvania Human Relations Act ("PHRA") claims. *See Rinehimer,* 292 F.3d 375, 382 (3d Cir.2002); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999).

ered entity as constituting such limitation;

(2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) has no such impairment but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1); *see also Rinehimer v. Cemcolift, Inc.,* 292 F.3d at 381; *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 187 (3d Cir.1999). To be "disabled" under the "regarded as" portion of the ADA's definition of disability, Eshelman must demonstrate that: (1) despite having no impairment at all, Agere erroneously believed that she had an impairment that substantially limited one or more of her major life activities; or (2) she had a non-limiting impairment that Agere mistakenly believed limited one or more of her major life activities. *See Tice v. Centre Area Transp. Auth.,* 247 F.3d 506, 514 (3d Cir. 2001) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). "Even an innocent misperception based on nothing more than a simple mistake of fact as to the severity ... of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." *Deane v. Pocono Medical Center,* 142 F.3d 138, 144 (3d Cir.1998); *see also Taylor,* 177 F.3d at 182. The relevant inquiry relates to the perception, or intent, of the employer; not whether the plaintiff was actually disabled at the time. *Capobianco v. City of New York,* 422 F.3d 47, 57 (2d Cir.2005). An employer may not "extrapolate from information provided by an employee based on stereotypes or fears about the disabled," *Taylor,* 177 F.3d at 193, but proof of stereotypes and prejudice is not required.

Under any scenario, the perceived condition must be substantially limiting under the law. *Sutton,* 527 U.S. at 490, 119 S.Ct. 2139. The impairment must limit a major life activity and the limitation must be substantial. *Capobianco,* 422 F.3d at 56. The ADA's terms must be "interpreted strictly to create a demanding standard for qualifying as disabled," *Toyota,* 534 U.S. at 197, 122 S.Ct. 681, yet Congress also expressed a "strong remedial intent" to extend coverage beyond only individuals with extreme impairments. *Taylor,* 177 F.3d at 186. Although the statute does not define the term "major life activities," EEOC regulations identify major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).

## III. Evidence

### A. "Regarded as" Disabled Claim

Eshelman began her career in 1981 with Agere's predecessor company, Western Electric. Over the next twenty years, Eshelman advanced through the company, eventually earning the position of supervisor of Chief Information Office (CIO) of Agere's Reading facility. In this position, Eshelman was responsible for supervising and supporting union technicians and acting as a liaison between union and management. Her work involved the use of computers, but she did not have the technical skills to write or install complicated programs.

Eshelman was diagnosed with breast cancer in 1998 and took a leave of absence from work from September 1998 until March 1999. She returned to work on a part-time basis with the support of her supervisors, Joseph DiSandro and David Baily. After her return, Eshelman advised DiSandro and Baily she was having problems with her short-term memory, a condition she attributed to her cancer

treatment and referred to as "chemo brain."[3] Eshelman apparently was able to compensate for her memory deficit by carrying a notebook and making sure she took more notes than she had previously. Eshelman's need to take notes did not adversely affect her work performance or Agere's perception of her as a valued employee.

Several months after returning to work, Eshelman advised her supervisors she had a concern about driving to unfamiliar places, which she also attributed to her chemotherapy and its resulting memory lapses. To compensate for her driving concerns, Eshelman arranged to car pool or participate in meetings by telephone. For example, in late 1999 or early 2000, a meeting was scheduled in Allentown, and she asked DiSandro if he would drive her to the meeting. Instead, DiSandro excused Eshelman from attending the meeting. Eshelman also testified that if she was going somewhere she "hadn't been for a while or someplace new," she would "go blank at times." Tr. 8/1/05 at 108. When this occurred, Eshelman would pull over to get her "focus back." *Id.* Eshelman would also travel to an unfamiliar location with someone several times "until it became familiar to me and I was able to retain it." *Id.* After her surgery, Eshelman would ride with one of the employees she supervised when she was required to attend meetings at Agere's facility in Breinigsville, Pennsylvania.

It is uncontested that on her return to work, Eshelman excelled at her job, as evidenced by her outstanding performance appraisals, promotions, raises, and bonuses. Her performance appraisals were completed by DiSandro and included an overall assessment from DiSandro and Baily. Eshelman received the highest rating possible in the year of her leave of absence for cancer treatments and for the year 2000, when her performance earned her a substantial bonus of $10,000. In June 2001, DiSandro informed Eshelman she would be promoted to a higher managerial position. Baily approved the promotion and its $7,000 raise.

Only four months later a business downturn decimated Agere, eventually resulting in the layoff of 18,000 employees worldwide and the closure of its manufacturing operation in Reading, Pennsylvania, where Eshelman had worked. As part of a company-wide reduction in force (Force Management Program or "FMP"), Eshelman was selected for lay-off effective December 30, 2001. Agere's handling of this process was the primary focus at trial.

The FMP was designed to rank employees based on an objective assessment of skills that would be needed in the restructured company. Employees who scored below a certain level were identified for possible lay-off. Consistent with his desire to retain Eshelman, and based on her excellent past work history, DiSandro initially ranked Eshelman highly, and efforts were made to avoid selecting Eshelman for the lay-off by transferring her to other Agere locations. Unknown to Eshelman or even DiSandro, a transfer was necessary because the long-range plan of Agere included closing the Reading site, which

---

**3.** The record includes a letter from Eshelman's family physician Beverly J. Niehls, M.D., in support of her claim that she suffered a cognitive dysfunction resulting from her chemotherapy treatment referred to as "chemo brain." Although this correspondence does not contain an actual diagnosis that Eshelman suffers from this condition, Dr. Niehls explained that this condition "can include deficiencies in verbal memory and psychomotor functioning," and that Eshelman had "mentioned that she struggled with short term memory loss." (P's Exh. 43).

would eliminate Eshelman's job.[4] However, a transfer would increase her commute and require her to drive to the less familiar facilities in Breinigsville and Allentown. When DiSandro alerted Eshelman of the possibility of covering these additional sites, she expressed concern about traveling with her memory problems. Eshelman said she would "have trouble with the drive" without carpooling, explaining that "[s]ince my chemo my memory banks storing sense of direction are flawed—a fact I don't like to brag about." (Pl.Exh. 7) (October 25, 2001 e-mail). Eshelman eventually formalized her concerns by sending DiSandro an e-mail on October 26, 2001, citing: 1) increased commuting expense; 2) hardship of daily commute, especially in bad weather; 3) the potential relocation expenses; 4) her husband's Berks County residency requirement; and 5) the potential for some telecommuting. (P. Exh. 10).[5] She also clearly stated her confidence in her ability perform any job.

DiSandro discussed Eshelman's travel concerns with Baily and Stephen Levanti, Agere's senior manager in charge of manufacturing. At Baily and Levanti's direction, DiSandro changed Eshelman's score from one of the highest to one of the lowest in less than a day's time. DiSandro testified that the change in Eshelman's score was based, in part, on Agere's perception that Eshelman was unable to travel to Agere's Allentown and Breinigsville sites. Eshelman's new, lower score was also based on Agere's assessment of skills needed for the remaining positions at the new sites, as opposed to her past performance. Nevertheless, the issue was never discussed further with Eshelman. Instead, she was deemed lacking sufficient skills and laid off.

The parties agree Baily's testimony is critical to resolving Eshelman's post-trial motions. Baily, who ultimately made the layoff decision, testified that a concern about Eshelman's ability to travel was one of three factors that made a difference in selecting Eshelman for layoff.[6] Baily acknowledged this concern was based on his knowledge that Eshelman had expressed difficulty with travel to new destinations as a result of a condition related to her treatment for breast cancer. When Eshelman was laid off, Baily associated her travel concerns with the memory issue caused by

---

4. After Eshelman's lay-off, the Reading facility was closed; DiSandro and Baily were also laid off.

5. Eshelman chose not to mention her memory difficulties.

6. On cross-examination Baily testified that DiSandro provided information about Eshelman that was considered in this lay-off decision:
 QUESTION: What was the information that was provided?
 BAILY: Well, one information I knew on my own, was that Joan had not yet become more involved in application support, although that would have been a natural progression in her new role. The second was the need for specifically supervising union employees, was going to become less and less skill needed within Agere, unfortunately. The third was that a question arose regarding Joan's ability to travel extensively between, minimally, Breinigsville and possibly Allentown.
 QUESTION: That was your testimony [at the deposition] right?
 BAILY: That is correct.
 QUESTION: There were three reasons. The third was the travel reason.
 BAILY: The third was the ability to perform the job in Breinigsville and Allentown.
 QUESTION: And that was because of travel, not because she couldn't do it once she got there.
 BAILY: Her ability to travel and her willingness to travel, yes.
 QUESTION: So, it was a factor that made a difference, right?
 BAILY: Yes.
 (Tr. 8/3/05, at 215–16).

her chemotherapy.[7]

Yet, Baily also testified that Eshelman never appeared to be limited in her thought processes, and he did not believe she had any physical or mental problem that affected her ability to perform her job or any job that would remain after the restructuring at any Agere site. Moreover, Baily said Eshelman's ability and willingness to support sites other than Reading was not the deciding factor in the selection decision. Eshelman presented no evidence to rebut Baily's articulated reasons. In fact, counsel for Eshelman argued that Baily's concern about Eshelman's ability and willingness to travel to the other sites was the most powerful evidence of Agere's discrimination. The jury's verdict mandates that I credit such inferences.

## B. "Record of" Disability Claim

Eshelman established that during her leave of absence her doctor regularly submitted documents to Agere concerning her condition. Eshelman kept Agere's Health Services Department's nurse informed of her health status, and her medical file recorded her cancer diagnosis and subsequent treatment with chemotherapy. Agere was also on notice of Eshelman's short-term memory loss because she told DiSandro and Baily about her condition and the steps she took to compensate for her memory limitation. Eshelman did not request any work accommodation, except that she be allowed to write down her assignments. This in no way affected her ability to perform her job requirements; her employment record establishes that after her return to work, Eshelman excelled at work.

The other record of Eshelman's memory issues or driving concerns were e-mails to DiSandro on October 25 and 26, 2001, and DiSandro's interaction with his superiors on the issue, during the lay-off decision-making process.

## III. Discussion

The evidence established Agere regarded Eshelman as having cancer-related memory difficulties, including her pre-lay-off concern with driving to Agere's Allentown or Breinigsville facilities from her

7. Eshelman asserts the following testimony establishes her "regarded as" claim:

QUESTION: It is true, isn't it, that the question of Mrs. Eshelman's ability to travel to Breinigsville and Allentown was one of the factors that made a difference in the decision to put Joan Eshelman at risk?

BAILY: It had an impact on whether she would be able to perform one of the remaining jobs at Breinigsville or Allentown.

QUESTION: So, therefore, it was one of the factors that made a difference, correct?

BAILY: It was a consideration, yes.

\* \* \* \* \* \*

QUESTION: But apparently, as you learned, Mrs. Eshelman was specifically asked about traveling to Breinigsville and Allentown, correct?

BAILY: Evidently, from Joe's e-mails, yes.

QUESTION: Okay. Mr. DiSandro, after he asked those questions, did report back to you that Joan had some concerns based or her personal situation. Correct?

BAILY: Correct.

QUESTION: Okay. And when he reported back to you, you connected those concerns with the effects of her cancer that you had known about from the past, right?

BAILY: The concern of her driving with the connect-connection with the cancer, yes.

QUESTION: Okay. So, you did make the connection. So, at the—

BAILY: At that time.

QUESTION:—time this decision-making process was going forward, with you as the ultimate decision maker, you knew that the issue that related to her ability to get to Breinigsville and Allentown was derivative of the problems subsequent to her cancer treatment, right?

BAILY: Correct.

(Tr. 8/3/05, at 213–14, 218).

home in Reading. I must determine whether the jury had sufficient evidence to conclude Agere perceived Eshelman's memory problems as substantially limiting her in the major life activities of thinking and working. The verdict must be sustained if the evidence shows that (1) Eshelman had no impairment, but Agere erroneously believed she did and that it substantially limited her ability to think or work; or (2) Eshelman had a non-limiting impairment that Agere mistakenly believed limited her ability to think or work.

Eshelman contends that the jury verdict must be sustained under the following logic: (1) Eshelman is a breast cancer survivor; (2) her chemotherapy cancer treatment caused some memory loss problems; (3) thinking and working are major life activities; and (4) therefore, her memory problems affected her ability to perform essential functions of her job. Eshelman asserts that such evidence supports the jury verdict that she is substantially limited in the major life activities of working and thinking. At oral argument, Eshelman conceded that no legal authority directly supports her theory and I can find none.

Agere contends it regarded Eshelman merely as having possible difficulty driving long distances or commuting to work, and the inability to perform these activities cannot establish a substantial limitation of a major life activity. Regardless how the question is characterized, Eshelman's contention that she is substantially limited in the major life activities of thinking and working ultimately rests on Agere's perception of Eshelman's memory problems. Eshelman's difficulty driving to Agere's facilities in Breinigsville and Allentown

was only the most recent manifestation of her chemotherapy side effects. Agere also knew Eshelman had previously suffered from chemotherapy-related memory problems while traveling, had found it necessary to take additional notes at work, and needed to carpool with coworkers to remote business sites. Given this evidence, I cannot limit my inquiry solely to Eshelman's memory-related driving difficulties, as Agere suggests.

 Proof of a substantial limitation on the major life activity of working, which involves a class-based analysis, varies slightly from the proof required to satisfy other major life activities, such as thinking. The only Supreme Court decision to discuss a major life activity other than working is *Toyota*, 534 U.S. 184, 122 S.Ct. 681, which addressed the activity of performing manual tasks. Whereas the major life activity of working focuses on the effect of the impairment in the workplace, the major life activity of thinking focuses on the effect of the impairment on tasks central to most people's daily lives. *Compare Toyota*, 534 U.S. at 198, 122 S.Ct. 681 (to be substantially limited in performing manual tasks, impairment must prevent or severely restrict individual from doing activities "that are of central importance to most people's daily lives") *with Sutton*, 527 U.S. at 491, 119 S.Ct. 2139 (to be substantially limited in performing activity of working, impairment must prevent individual from performing a broad class of jobs, rather than a specific job); *see generally EEOC v. United Parcel Service, Inc.*, 306 F.3d 794, 802–03 (9th Cir.2002) (discussing different analytical models for major life activities of working and seeing).[8] An impairment is substan-

---

8. The jury instructions failed to note this subtle difference and neither party objected to the charge as given or raised this point during

the charge conference. Although Agere's proposed pre-trial instruction had noted the distinction, Agere did not contest the point when

tially limiting if it has a "permanent or long-term impact." *Toyota*, 534 U.S. at 196, 122 S.Ct. 681 (citing EEOC regulations); *Taylor*, 177 F.3d at 186 (citing EEOC regulations).

■ The regulations[9] state an individual is substantially limited in the major life activity of working if there is a significant restriction in the ability "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I). To prevail on a "regarded as" claim under 42 U.S.C. § 12102(2)(A), Eshelman must show she was discriminated against by Agere because it believed she was unable to work in a particular class or broad range of jobs, as required in the definition of disability under § 12101(a)(2). *See Sinkler v. Midwest Prop. Mgmt. Ltd. Pshp.*, 209 F.3d 678, 686 (7th Cir.2000).

Agere claims that Eshelman's problems driving and commuting cannot, as a matter of law, limit the major life activity of working. Its argument is premised on the notion that the ADA does not hold an employer responsible for ensuring that a physically or mentally impaired employee who can work is also able to navigate the route to the workplace. Yet this case is not simply about commuting and driving.

Those activities were merely the recent manifestation of Eshelman's lingering memory problems from her cancer treatment; Agere also was aware of other examples of Eshelman's memory problems. The jury's verdict was based on a reasonable inference that as Agere selected the employees fortunate enough to remain in its reduced and restructured workforce, Agere viewed Eshelman's chemotherapy side effects—either correctly or incorrectly—as rendering her unable to think or work. Eshelman's driving difficulty was only one manifestation of those side effects.

Although courts in other circuits have rejected ADA claims based on an impairment resulting in an inability or unwillingness to drive, none of those decisions squarely address Eshelman's case. Moreover, in light of Eshelman's other evidence of lingering cancer-related memory problems, I need not reach the question whether problems driving or commuting—without more—can substantially limit a major life activity.

Thus, decisions rejecting ADA claims related solely to driving limitations fall short of addressing the more fundamental issue of Agere's perception of Eshelman's overall post-cancer memory impairment, e.g., problems going blank, the need to

---

I inadvertently failed to include it in the charge. Moreover, neither party stressed the import of the distinction in their arguments to the jury and Agere does not cite it as a basis for a new trial. Thus, my failure to clarify between the limitations required for the activities of working and thinking does not constitute plain error affecting Agere's substantial rights under Fed.R.Civ.P. 51(d)(2). *See* Advisory Committee Notes (plain error analysis depends on obviousness of the mistake, importance of the error, cost of correcting the error, and impact of verdict on nonparties). Moreover, in Eshelman's case, the activities of thinking and working were closing intertwined and explored at trial solely through

the context of Eshelman's suitability to remain in the Agere workforce. The error did not undermine the integrity of the trial and did not result in a miscarriage of justice. *See Bostic v. Smyrna School Dist.*, 418 F.3d 355, 359 (3d Cir.2005); *Fashauer v. New Jersey Transit Rail Operations*, 57 F.3d 1269, 1289 (3d Cir.1995).

**9.** The persuasive authority of the regulations is an open issue since no agency has been given the authority to issue regulations interpreting the ADA. *Toyota*, 534 U.S. at 194, 122 S.Ct. 681; *but see Tice*, 247 F.3d at 515 n. 8 (deferring to EEOC regulations).

carpool, and the increased need to take notes. For example, in *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329–30 (11th Cir.2001), the Court held that an individual who experienced epileptic seizures and was unable to drive for six months was not disabled under the ADA where there was no evidence that she was unable to perform her work duties. *Id.* The Court rejected claims that driving was a major life activity and that the inability to drive substantially limited the ability to work. *Id.* at 1329–30. The Court noted that "millions of Americans do not drive, millions are passengers to work, and deprivation of being self-driven to work cannot be sensibly compared to inability to see or to learn." *Id.; accord Collado v. United Parcel Service*, 419 F.3d 1143, 1157–58 (11th Cir.2005) (citing *Chenoweth* ).

Eshelman's case differs from *Chenoweth* for two reasons. First, Eshelman did not contend driving was a major life activity. Second, the Court reviewed on summary judgment whether the plaintiff's inability to drive was disabling, not whether the employer regarded plaintiff as disabled. Thus, the Court focused on whether plaintiff had shown sufficient evidence she could actually perform her job. *Id.* at 1330. The distinction is significant; the employer's perception of Eshelman's limitation is the pivotal inquiry, not whether Eshelman was actually able to perform her job.

It is tempting to conclude that because Eshelman had excelled in her job in the past and was recently promoted, Agere could not have perceived her as disabled when it was selecting its restructured workforce. This conclusion has even more allure because Agere was struggling with a massive worldwide layoff and was making difficult on-the-spot decisions about thousands of valued employees. The evidence could easily support such a conclusion—if the jury had reached it. Instead, the jury drew the equally plausible conclusion that Agere perceived Eshelman as disabled based on multiple examples of her post-cancer history of memory problems. The jury could have reasonably concluded Agere chose to layoff Eshelman simply because she may not have been able to immediately step into a realigned workforce required to learn and remember new skills. As such, the evidence supports the verdict that Agere erroneously perceived Eshelman as precluded from performing a broad class of jobs, i.e., substantially limited in her ability to work.

A recent Seventh Circuit decision illustrates the point. In *Sinkler*, 209 F.3d at 686, the Court held that a plaintiff's inability to remember driving directions did not substantially limit the major life activity of working. At first blush, the holding would suggest Eshelman's position lacks merit. Yet, the Court separately analyzed whether the evidence established plaintiff was actually disabled and "regarded as" disabled. The Court's analysis demonstrates the subtle nature of how "regarded as" cases under the ADA must be analyzed differently from cases involving proof of an actual disability.

The plaintiff was diagnosed with a phobia that caused intense anxiety and distress when she had to drive in an unfamiliar area. *Id.* at 681. Although plaintiff could drive in Kenosha, Wisconsin, where she worked, her position as a regional sales manager required that she travel beyond Kenosha. *Id.* at 681–82. Her employer fired her, which she alleged violated the ADA. *Id.* at 682. Affirming the grant of summary judgment to the employer on the issue of actual disability, the Court held that "commuting" was not a major life activity, because it is not as "significant" an activity as working or the other activities listed in the ADA. *Id.* at 684–85. The Court also concluded that plaintiff's inabili-

ty to perform jobs that required travel to unfamiliar areas failed to constitute a substantial limitation on the major life activity of working. *Id.* at 685. The Court reasoned that "'[g]etting to and from work assignments' is not a major life activity," and that plaintiff's alleged phobia did not substantially limit her ability to work. Instead, it merely prevented her from taking jobs that required regular travel to places outside of her "comfort zone." *Id.* at 685. Inasmuch as "many sales jobs require business travel to unfamiliar areas," the Court did "not believe that these jobs amount to a broad enough class to constitute a substantial limitation." *Id.*[10]

On the issue whether the employer "regarded" plaintiff as disabled, however, the relevant issue was whether the employer believed plaintiff's driving phobia limited the class of jobs plaintiff could perform more broadly than her phobia actually limited. *Id.* at 686. Thus, the Court acknowledged its inquiry must be refocused to determine a reasonable inference that the employer "believed her unable to commute to work generally." *Id.* The Court found a broad range of jobs remained open to the plaintiff despite her inability to commute as a sales manager, and there was no evidence the employer believed plaintiff "was incapable of driving at all." *Id.* at 687.

Here, however, the evidence established Eshelman's memory problems were not limited to an inability to commute. In addition, Eshelman's memory problems re-sulted in her permanent layoff from all Agere jobs. Agere viewed her memory problems, which had resurfaced in the context of driving limitations, as a factor disqualifying her from its new restructured and relocated workforce. Agere's perception of Eshelman's memory problems proved fatal to her career. Eshelman's memory impairment was one of three factors that effectively precluded her from every job remaining under Agere's restructured operation outside of Reading. The jury's function was to determine whether Agere's non-discriminatory justification for Eshelman's layoff was the actual reason; it determined it was not.

The evidence established Eshelman suffered a substantial limitation resulting from her memory impairment. The jury could have concluded Agere's perception of Eshelman's overall memory problems, not simply her difficulty learning driving directions to a new work site, effectively rendered Eshelman unable to perform any job at Agere. In isolation, Eshelman's driving difficulties may have proved insufficient. Viewed in the context of Eshelman's history of memory-related side effects from chemotherapy, however, Baily's testimony supports an inference that Agere believed—either sincerely or mistakenly—that memory problems rendered Eshelman unfit for any job in its restructured workforce. *See Taylor,* 177 F.3d at 188 (employer's perception that an employee cannot perform a wide range of jobs suffices to make out a "regarded as" claim).

---

**10.** *See also Wade v. General Motors Corp.,* 165 F.3d 29, 1998 WL 639162 (6th Cir.1998) ("inability to drive in darkness is a common phenomenon that, if classified as disabling, would make most of the American population over the age of 45 'disabled' under the [ADA]"); *see generally Jones v. Family Health Center, Inc.,* 323 F.Supp.2d 681, 688 (D.S.C.2003) (granting summary judgment under *Sinkler* where plaintiff's impairments limited her abil-ity to drive, but did not preclude her from a substantial class of jobs given her extensive education and experience); *Palmisano v. Electrolux Corp.,* 2000 WL 1100785, 2000 U.S. Dist. LEXIS 11015 (E.D.Pa.2000) (O'Neill, J.) (granting summary judgment under *Sinkler* where plaintiff failed to offer evidence that a 15–mile driving restriction would limit him from an entire class or broad range of jobs).

The jury weighed all of the evidence: Baily's testimony, Eshelman's e-mails, the opinion of Eshelman's doctor, and Eshelman's testimony of how chemotherapy affected her return to work, i.e., her tendency to go blank, difficulty commuting, and her need to take notes. Agere cannot recast the verdict as based solely on Eshelman most recent driving difficulties.

Allowing damages under the ADA based on this evidence will not impermissibly extend the ADA to cover employees with a mere inability to commute to the workplace. An employer violates the ADA when it believes an employee "has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 476–77, 119 S.Ct. 2139. Examined in the light most favorable to Eshelman, the evidence established that as Agere cutback to a leaner, restructured workforce, it erroneously perceived Eshelman as significantly restricted in her ability "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Sufficient evidence supported the jury's view that Eshelman's uncontested cancer-related memory impairment—which resurfaced in 2001 in the context of her willingness to commute—caused Agere to perceive her as substantially limited in her ability to work.

In addition, the jury could have concluded based on testimony of Eshelman's memory problems that Agere regarded her impairment as limiting the major life activity of thinking. The evidence established Agere believed her memory impairment prevented or severely restricted her "from doing activities that are of central importance to most people's daily lives." *Toyota*, 534 U.S. at 198, 122 S.Ct. 681. This, of course requires an "individualized assessment" of the effect of the impairment. *Id.*

Eshelman's testimony that she tended to "go blank sometimes" and that she sometimes needed to pull over to "focus back" while driving to new locations could lead a reasonable factfinder to determine she was having trouble thinking and remembering, not merely struggling with the physical act of driving. *See Gagliardo v. Connaught Laboratories*, 311 F.3d 565, 569 (3d Cir. 2002) (thinking, remembering and cognitive functioning are major life activities).[11] Baily's testimony supports an inference that he was concerned with Eshelman's cancer-related memory issues and her ability to learn new things in a new job. *See, e.g.* Tr. 8/3/05 (ability to travel "had an impact on whether she would be able to perform one of the remaining jobs"). Thus, if Eshelman had walked to work, and Agere had moved to a new plant also within walking distance, but nevertheless laid her off based on her undisputed history of memory problems, Agere's decision would be properly focused on Eshelman's ability to mentally process a new route. Viewed as such, Eshelman's commute is simply the manifestation of her limitations in thinking, i.e., her claim rests not on her inability walk to work, but on her difficulty processing new information.

---

11. In *Gagliardo*, a plaintiff with multiple sclerosis was found substantially limited in her major life activity of concentrating and remembering as a result of the disease. Unlike Eshelman, however, Gagliardo presented evidence that her work performance suffered greatly as the result of her multiple sclerosis, as well as expert testimony that the disease was incurable, caused her fatigue and affected her ability to think, focus, and remember. *Id.* Gagliardo made mistakes at work, failed to complete assigned tasks, and was disciplined for poor job performance. *Id.*

The jury could reasonably infer that Agere perceived Eshelman as disabled with an overall difficulty thinking based on evidence of Eshelman's post-cancer side effects in its entirety. Historical evidence of Agere's highly positive view of Eshelman's past performance is, of course, relevant and could support an equally reasonable inference that Agere had no discriminatory intent. The jury, however, is presumed to have weighed such evidence and rejected it.

A recent non-precedential opinion by the United States Court of Appeals for the Third Circuit does not undermine the verdict in this case. In *Collins v. Prudential Investment & Retirement Serv.*, No. 03–2356, 119 Fed.Appx. 371, 375–76, 2005 U.S.App. LEXIS 148, at *9–14 (3d Cir. Jan. 4, 2005), the Court affirmed the grant of judgment as a matter of law when plaintiff produced insufficient evidence that she suffered from attention deficit disorder. The Court reasoned that plaintiff's success at work, her educational background, and her extensive involvement in civic and professional activities were inconsistent with substantial limitations in her ability to think. That decision, however, involved a question of whether the plaintiff was actually disabled, not whether she was mistakenly regarded as disabled by her employer. In Eshelman's case, the jury was required to look prospectively and examine Agere's perception of Eshelman as a candidate for retention in its new, smaller workforce. Eshelman's past performance, albeit relevant to the issue, is not dispositive.

Moreover, as the verdict winner, Eshelman is entitled to all reasonable inferences from the evidence. Although Agere claims Eshelman's inability or unwillingness to support sites other than Reading was not the deciding factor in the lay-off decision, the jury's verdict establishes it rejected Agere's nondiscriminatory rationale. Viewed in the light most favorable to Eshelman, the evidence proved Agere regarded her as limited in her ability to think because it perceived her memory problems as preventing or severely restricting her in her ability to think, an activity "of central importance to most people's daily lives." *Toyota*, 534 U.S. at 198, 122 S.Ct. 681.[12]

The Second Circuit's recent decision in *Capobianco*, 422 F.3d at 59–61, illustrates the proper inquiry whether an employer unlawfully regarded an employee as disabled. The Court reversed the trial court's grant of summary judgment against a plaintiff who had been fired from his job with the sanitation department because of night blindness. *Id.* at 50 Evidence that the employer perceived plaintiff as disabled included: prohibiting plaintiff from all driving at any time, designating plaintiff to clerical duties, and refusing to evaluate plaintiff's work performance for two rating periods because he was unjustly deemed "unrateable." *Id.* at 52. The Court held a jury could find that the employer incorrectly regarded plaintiff as unable to drive at any time because he was substantially limited in his ability to see at night and as being unable to perform any-

---

12. Eshelman's reliance on on *Champlin v. Wonewoc–Center Sch. Dist.*, 72 Fed.Appx. 445, 448 (7th Cir.2003) is misplaced. There, the Court noted that "attendance" is an essential requirement of most jobs, but it did so only in the context of whether a plaintiff was a "qualified individual" under the ADA, that is, whether she could perform the "essential functions of the employment position," not whether an inability to commute substantially limited the activities of working or thinking. *See id.* (citing *EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943, 948–49 (7th Cir.2001) (en banc) (plaintiff with "woeful" attendance record is not a "qualified individual" because ADA does not protect persons with erratic and unexplained absences even when they result from a disability)).

thing other than clerical duties. *Id.* at 60. Thus, a jury could find the employer believed plaintiff's night blindness substantially limited his ability to see as compared to the average person in the general population. *Id.* Similarly, in *Taylor* and *Deane,* the Third Circuit found sufficient evidence to support an employer's perception of the plaintiffs as disabled. In *Taylor,* 177 F.3d at 188–89, the employer relied on medical records to conclude plaintiff was unable to perform a wide range of jobs that required standing, walking, lifting, and moving. In *Deane,* 142 F.3d at 145, the employer perceived the plaintiff as disabled based on documented confusion by company officials concerning the true extent of the impairments.

Although Eshelman offered no direct evidence that Agere regarded her as disabled, the jury could have reasonably inferred discriminatory intent based on Eshelman's medical history of memory impairment, the accommodations she had employed upon returning to work, and her cancer-related memory concerns. Agere was not required to have entertained any stereotype or fear about cancer survivors. It was sufficient that the jury weighed the stated reasons for her dismissal and concluded Agere believed a cancer survivor with memory problems had no place in its new workforce.

Accordingly, I deny Agere's request for judgment as a matter of law with respect to Eshelman's claim that Agere regarded her as disabled.

## B. Record of disability claim

I also hold the evidence established Eshelman had a sufficient record of a disability. In determining whether an individual has a record of a substantial limitation in a major life activity, I must consider the following factors: "the nature and severity of the impairment; the dura-

tion or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii). Although substantial limitations should be considerable, "utter inabilities" are not required. *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). The determination whether a person has a record of disability must be made on a case-by-case basis. *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139

Cancer is one of the substantially limiting conditions the ADA was intended to protect. Congress unequivocally stated its intention to protect individuals with a record of cancer. *See* H. Rep. No. 101–485, pt. 3, at 29 (1990). Interpretive guidelines to the ADA confirm the "record of" provision is intended to protect "former cancer patients from discrimination based on their prior medical history." 29 C.F.R. Pt. 1630 App. § 1630.2(k). Further, the EEOC's Technical Assistance Manual for the ADA confirms that the ADA "protects people with a history of cancer" even when their "illnesses are either cured, controlled or in remission." EEOC Technical Assistance Manual § II at 2.2(b).

It is not enough to establish a record of a diagnosis and treatment for cancer to satisfy the requirements of the ADA. Eshelman must have a history of, or been misclassified as having, an impairment that substantially limits a major life activity. *See Taylor v. Phoenixville Sch. Dist.,* 113 F.Supp.2d 770, 774 (E.D.Pa. 2000) (Joyner, J.). Moreover, if Eshelman's condition fails to satisfy the definition of impairment set forth in 42 U.S.C. § 12102(2)(A), she cannot assert she was terminated because she had a record of that condition. *See Sinkler,* 209 F.3d at 683 (citing *Davidson v. Midelfort Clinic,*

*Ltd.*, 133 F.3d 499, 510 n. 7 (7th Cir.1998) (ADA requires "not simply a diagnosis, but a record reflecting the kind of impairment that would impose a substantial limitation on one or more of the plaintiff's major life activities")). If a plaintiff's condition does not rise to the level of a disability as defined by the ADA, she cannot recover even if her employer terminated her expressly because she had a record of her condition. *Id.*

Agere had a record of Eshelman's breast cancer from her leave of absence between September 1998 and March 1999 for surgery and chemotherapy. Agere also acknowledges it was aware that Eshelman had complained of some short-term memory loss and had difficulty driving in unfamiliar places. The parties agree her job performance was excellent from the time she returned to work through the two and one-half years before she was laid-off.

 Although a leave of absence for a medical condition does not, by itself, create a record of a disability, *see Dawley v. Erie Indemnity Co.*, No. 03–3860, 100 Fed. Appx. 877, 2004 U.S.App. LEXIS 10793 (3d Cir. June 3, 2004) (unpublished op.) (plaintiff who took a one-year leave of absence for surgery to remove a brain tumor and to recover from surgery did not suffer from a "physical impairment that substantially limits [a] major life activity," nor did he have a "record of such an impairment"), the jury had sufficient evidence to conclude that Eshelman had a record of being substantially limited in the major life activities of working and thinking.

In one sense, the evidence can be viewed as proving that Eshelman demonstrated nothing beyond a temporary inability to work, with no residual limitations on her ability to work or think. Other than her leave of absence for cancer treatment, the evidence showed only a record of her inability to commute to Breinigsville

or Allentown. Moreover, Agere regarded Eshelman as a valued employee and promoted her to a higher pay grade. Yet the jury apparently rejected this evidence and concluded that the record of Eshelman's cancer and ensuing memory problems precluded her from retention in Agere's restructured workforce. Perhaps the most powerful evidence of this fact is the abrupt reversal of Eshelman's score in the ranking of employees scheduled for layoff. Eshelman plummeted from the top of the list to the bottom of the list of favored employees after upper management learned of her memory-related travel concerns. A jury could reasonably conclude this established a record of an impairment substantially limiting Eshelman's ability to think and work. Although Agere forcefully contended Eshelman's new score resulted from its focus on skills needed for the remaining jobs, and not past performance, the jury weighed Agere's justification and found a discriminatory motive in Agere's action.

## C. Alternative Motion for a New Trial pursuant to Rule 59(a)

 Pursuant to Fed.R.Civ.P. Rule 59(a), I also deny Agere's request for a new trial based on my decision not to instruct the jury that driving and commuting are not major life activities.

 I have broad discretion in deciding a motion for a new trial when the proffered ground is legal error. *Klein v. Hollings*, 992 F.2d 1285, 1289–90 (3d Cir. 1993); *Williamson v. CONRAIL*, 926 F.2d 1344, 1348 (3d Cir.1991). Jury instructions are reviewed for abuse of discretion to determine whether they properly apprised the jury of the issues and the applicable law and are not misleading or inadequate. *Dressler v. Busch Entertainment Corp.*, 143 F.3d 778, 780 (3d Cir.1998); *see also*

*Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 114–115 (3d Cir.1999).

Agere asserts that by failing to instruct the jury that driving and commuting were not major life activities, I permitted the jury to consider driving and commuting as if they were major life activities. This claim lacks merit. Although I declined to instruct the jury on which activities, such as driving and commuting, are not major life activities, I properly instructed the jury on the two theories of recovery at issue in the case. Read in its entirety, therefore, the charge properly focused on the two relevant major life activities. Agere takes no issue with my description of those activities. Moreover, any failure to address the issue of driving and commuting is undermined by the existence of other evidence establishing Eshelman's cancer-related memory impairments, which Baily admitted considering in reaching the layoff decision.

 For the reasons set forth at trial, I also reject Agere's final contention that a new trial is warranted because I improperly allowed the jury to consider Eshelman's claim that Agere failed to accommodate her disability. Agere had sufficient notice in the complaint and a central issue at trial was the propriety of Agere's summary dismissal of Eshelman after she raised her memory-related travel concern. Contrary to Agere's post-trial assertion, the instructions did not lead the jury to believe that she had an actual disability. In fact, in the legal instructions on unlawful retaliation for requesting a disability, the jury was explicitly instructed that proof of actual disability was not required. Eshelman's actual disability was never at issue. Read as a whole, therefore, the instructions clearly submitted the case on the appropriate theories.

An appropriate order follows.

### ORDER

AND NOW, this day of , 2005, upon consideration of the Defendant's motion for judgment as a matter of law and/or new trial, the Plaintiff's response thereto, and the positions asserted by counsel at oral argument, and for the reasons set forth in the accompanying memorandum,

IT IS HEREBY ORDERED the motion is DENIED.